# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

CINDY LAWSON,                       )
                                   )

            **Plaintiff,**         )

                       )     **CAUSE NO. 1:11-CV-228**

    **v.**                   )

                       )

BETHESDA LUTHERAN       )

COMMUNITIES, INC.,          )

                       )

           **Defendant.**      )

## OPINION AND ORDER

## I. INTRODUCTION

Plaintiff Cindy Lawson worked for Defendant Bethesda Lutheran Communities, Inc. ("Bethesda"), which serves disabled individuals, as a Program Manager for several years. From 2007 to 2011, Bethesda received several complaints about Lawson's lack of interpersonal skills, harsh tone, and abrasiveness from other employees as well as a member of the community. Two of Lawson's performance evaluations from these years further documented Lawson's purported difficulty appropriately interacting with her staff and peers. Following Lawson's behavior during a snow storm in February of 2011, Bethesda initiated an investigation into Lawson's conduct. On the morning of March 28, 2011, Bethesda interviewed Lawson as part of its investigation and then placed her on administrative leave pending completion of the investigation.

That same afternoon, Lawson sought treatment for anxiety from a physician assistant and obtained a note indicating that she could not work from March 28, 2011, to April 5, 2011. After Lawson's husband delivered the note to Bethesda later that day, Bethesda mailed Lawson

paperwork for requesting leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §

2601 *et seq.*, on March 31, 2011. On April 6, 2011, before Lawson had returned the FMLA

paperwork, Bethesda terminated her.

Lawson believes that Bethesda fired her because she needed time off for her anxiety and

subsequently sued Bethesda, alleging that Bethesda interfered with her entitlement to FMLA and

terminated her in retaliation for requesting FMLA leave.[1] Bethesda counters that it fired Lawson

for her poor performance and inappropriate conduct and moved for summary judgment on

Lawson's claims. (Docket # 33.)

Ultimately, for the following reasons, Bethesda's Motion for Summary Judgment will be

GRANTED.

## II. FACTUAL AND PROCEDURAL BACKGROUND[2]

Bethesda Lutheran Communities, Inc., provides housing, support, and services to

individuals with intellectual and developmental disabilities. (Faller Aff.—attached as Ex. C to

Def.'s Statement of Material Facts ("Def.'s Fact Statement")—¶ 5.) After first working for

Bethesda from 2003 to 2005 (Faller Aff. ¶ 7; Lawson Dep.—attached as Ex. A to Def.'s Fact

Statement—22), Cindy Lawson was rehired by Bethesda in April 2006 as a Trainer (Lawson

Dep. 49, 51; Faller Aff. ¶ 8). About a month later, Lawson became a Program Manager and was

---

[1] Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting. (*See* Docket # 7.)

[2] For summary judgment purposes, the facts are recited in the light most favorable to Lawson, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Bethesda also filed a Motion to Strike portions of Lawson's affidavit accompanying her response in opposition to the motion. (Docket # 42.) But even when considering the evidence that Bethesda seeks to strike, Lawson's claims still fail as a matter of law, and summary judgment is therefore appropriate. As such, the Court will consider the evidence that Bethesda seeks to strike and deem its motion to strike (Docket # 42) MOOT.

thereafter responsible for overseeing Bethesda's group homes and staff. (Lawson Dep. 51-52; Faller Aff. ¶¶ 8-9.) Lawson's direct supervisor in this position was Kay Craig, the Area Director. (Craig Aff.—attached as Ex. D to Def.'s Fact Statement—¶ 3; Faller Aff. ¶ 10.)

In September 2007, Craig evaluated Lawson's performance for the prior year. (*See* Def.'s Fact Statement Ex. P.) Craig noted that "[a]lthough [Lawson] is a very strong leader, her ability to coach her staff needs additional refinement" and that she "needs to continue to be mindful of the tone she demonstrates both with other managers and with other department personnel." (Def.'s Fact Statement Ex. P at 7.)

According to a "critical incident log" recorded by Craig, in February 2008, Lawson was creating a negative work environment by discussing her issues concerning one manager with another manager and was "sternly warned" to resolve her issues with other managers by directly approaching them rather than drawing others into disagreements. (Def.'s Fact Statement Ex. R at 1.) During a follow-up discussion after this incident, Craig further instructed Lawson to bring all of her issues directly to Craig as her supervisor. (Def.'s Fact Statement Ex. S at 2.)

The following month, Lawson reported to Craig that, without Bethesda's knowledge or authorization, she had called a contact at the Bureau of Motor Vehicles ("BMV") to get information concerning a Bethesda employee. (Def.'s Fact Statement Ex. S at 2; *see* Lawson Dep. 77-80.) Craig subsequently cautioned Lawson to stop such independent investigating. (Def.'s Fact Statement Ex. S at 2.)

Shortly thereafter, in April 2008, Craig interviewed internal job applicants for a position at Bethesda. (*See* Def.'s Fact Statement Ex. S at 1.) After the interviews, Lawson questioned the candidates without Craig's direction or knowledge. (Def.'s Fact Statement Ex. S at 1.) Once

Craig made her decision, Lawson detailed her discussions with the candidates, expressing shock at Craig's decision. (Def.'s Fact Statement Ex. S at 1; *see* Lawson Dep. 80.) Following this incident, Craig issued a Counseling Record to Lawson for her inappropriate behavior and conduct in the workplace, detailing this April 2008 incident as well as her September 2007 performance evaluation, her February 2008 manager conflict issues, and her March 2008 unauthorized BMV investigation. (Def.'s Fact Statement Ex. S at 1-2.) Citing these incidents, Craig stated that Lawson was "creating an unpleasant work environment for the management team by inserting herself into issues and areas that are not her concern or responsibility." (Def.'s Fact Statement Ex. S at 2.) Lawson was then put on probation for three months and notified that if her conduct did not improve, she would be subject to "[f]urther corrective action up to and including termination." (Def.'s Fact Statement Ex. S at 1, 4.) Craig spoke with Lawson about these issues (Lawson Dep. 82-84), and Lawson subsequently submitted a written response acknowledging the Counseling Record and setting forth her intent to comply with its performance expectations. (Def.'s Fact Statement Ex. T; Lawson Dep. 86-87.)

Six months later, in Lawson's October 2008 performance evaluation, Craig noted that Lawson "made real progress" working collaboratively with other managers and other departmental personnel, but again stated that Lawson's "ability to coach and mentor her staff needs additional refinement." (Def.'s Fact Statement Ex. Q at 7.)

In June of 2009, Bethesda received an online complaint of purported "proactive bullying" by Lawson via its anonymous whistle blower reporting system. (Def.'s Fact Statement Ex. U at 1-2.) The complainant reported that Lawson was "constantly threatening the staff" at a Bethesda house with writing them up or shipping them to another house without justification and asked

that Lawson be sent "to some kind of program that would teach her tact and civil manners." (Def.'s Fact Statement Ex. U at 2.)  The record does not indicate whether Bethesda took any action in response to this complaint, and it was never shared with Lawson (Lawson Aff. ¶ 4).

Despite these incidents, Lawson received pay increases in 2009 and 2010.  (Lawson Aff. ¶ 24.)  Lawson further maintains that her annual performance evaluations for these years did not relate any negative evaluations or incidents.  (Lawson Aff. ¶ 25.)[3]

According to the record, Lawson next experienced disciplinary trouble in October 2010. (*See* Def.'s Fact Statement Ex. V.)  That month, Craig completed another "critical incident log" concerning Lawson's interaction with her staff.  (Def.'s Fact Statement Ex. V at 1.)  Specifically, one of Lawson's subordinates expressed that she felt scared and threatened by an email Lawson had sent, and Craig overheard Lawson discuss an issue with an employee on speaker phone. (Def.'s Fact Statement Ex. V at 1.)  Craig and Lawson met to discuss these incidents, and Lawson acknowledged that her tone can be "intimidating, mean, and harsh."  (Def.'s Fact Statement Ex. V at 2; Lawson Dep. 93-95, 98.)  Craig indicated that Lawson's perceived threatening or intimidating tone "negatively impacts the manager/employee relationship" and that Lawson needed to be very mindful of her tone, both verbally and in emails.  (Def.'s Fact Statement Ex. V at 1.)  In her deposition, Lawson further admitted that her harsh tone has "probably been an issue since 2003" with employees and possibly managers and that her tone and how she treats others has been discussed with her "a couple of times."  (Lawson Dep. 98-99, 225.)

In late February 2011, following complaints from Bethesda employees about Lawson's

---

[3] Unlike Lawson's 2007 and 2008 performance evaluations, her evaluations for 2009 and 2010 are not in the record.

harsh treatment during a snow storm, Mark Faller, Bethesda's Regional Human Resources Director, initiated an investigation into Lawson's conduct. (Faller Aff. ¶¶ 3, 11; Faller Dep.—attached as Ex. B to Def.'s Fact Statement—8, 76, 100, 110-11.) As part of the investigation, several Bethesda employees, including Alisha Imel, Laveasea Harvard, Megan Oakley, and Gillian Frazer, were interviewed, and their witness statements were taken. (Faller Aff. ¶ 12; *see* Def.'s Fact Statement Exs. W, X, Y, Z.)

Imel recounts that during this snow storm in the beginning of February 2011, she was scheduled to work, but called Lawson to tell her that she would not be coming in because there was a level one snow emergency on the roads. (Def.'s Fact Statement Ex. W; *see* Def.'s Fact Statement Ex. II.) Imel further explained that if she was on the road and got into an accident, she would get a ticket. (Def.'s Fact Statement Ex. W.) Lawson told her she had to be there (Def.'s Fact Statement Ex. W) and that, because of her job, if she drove carefully, she would not be ticketed (Def.'s Fact Statement Ex. II). Imel ultimately went into work, but felt that Lawson put her life in danger. (Def.'s Fact Statement Ex. W.)

During this same snow storm, Harvard spoke with Lawson over the phone regarding staffing issues. (Def.'s Fact Statement Ex. X at ¶ 2; Def.'s Fact Statement Ex. II at ¶ 2.) Lawson got loud and told Harvard to either "shut up, you are going to listen" (as Harvard claims), or "that she needed to be quiet and listen" or "hush" (as Lawson maintains). (Def.'s Fact Statement Ex. X at ¶ 2; Def.'s Fact Statement Ex. II at ¶ 2; Lawson Aff. ¶ 6.) Lawson abruptly hung up the phone and then refused to answer Harvard when she called back three times or immediately respond to her text message; Harvard purportedly left a "nasty voice message" when Lawson did not answer, which necessitated Lawson "need[ing] time" before she spoke to Harvard. (Def.'s

Fact Statement Ex. II at ¶ 2.)  Harvard further stated that Lawson threatened to report her, treated

her like a little kid, and was unprofessional.  (Def.'s Fact Statement Ex. X at ¶ 3.)  Although

Harvard felt like this was an isolated incident, she also indicated that she did not feel like she

could approach Lawson with issues because Lawson was "scary" and she did not want to be

yelled at.  (Def.'s Fact Statement Ex. X at ¶ 3.)

Lawson subsequently called Craig to report both of these incidents.  (Craig Aff. ¶ 4.)

During the call, Lawson was upset with her employees, and Craig attempted to calm her down.

(Craig Aff. ¶¶ 5-6.)  The following day, Lawson and Craig discussed the previous night's events.

(Craig Aff. ¶ 7.)  When Craig asked Lawson what she hoped to accomplish by getting into

arguments with her subordinates, Lawson responded that the employees had "no respect" for

management and that back in the "old days" employees would not talk to management the way

Harvard did.  (Lawson Aff. ¶ 7.)  But Lawson admitted that even her husband, who had overhead

at least one of the conversations, told her she needed to stop.  (Def.'s Fact Statement Ex. II at ¶

2; Craig Aff. ¶ 8.)

Along with Imel and Harvard, Faller also obtained witness statements from Oakley and

Frazier.  Among other "little things," Oakley detailed a previously undisclosed phone

conversation, in which Lawson, upset that Oakley had copied Craig on a particular email, called

Oakley and started yelling at her.  (Def.'s Fact Statement Ex. Y at 1.)  Lawson denies ever

yelling at Oakley.  (Lawson Aff. ¶ 8.)

In her witness statement, Frazier stated that she was "uncomfortable with how Cindy

Lawson deals with staff" and recounted an incident that occurred in early February 2011 when

one of Lawson's subordinates requested a transfer from a home that Lawson supervised to one

that Frazier supervised. (Def.'s Fact Statement Ex. Z at 1.) According to Frazier, when she approached Lawson to discuss the employee's work hours, Lawson became "confrontational," yelled at her, and "shoved" the employment offer sheet at her. (Def.'s Fact Statement Ex. Z at 1.) Lawson admits that Frazier came to talk to her about the employee's staff hours, but denies that she became confrontational, yelled at Frazier, or shoved anything at her. (Def.'s Fact Statement Ex. II at 2; Lawson Aff. ¶ 9.) At some point, Lawson called the employee in front of Frazier; Frazier claims that Lawson spoke to the employee in a "very nasty tone," like an "angry parent berating and belittling her," and that Lawson told the employee that she was "done" with her. (Def.'s Fact Statement Ex. Z at 1; Lawson Aff. ¶ 9.)

Later on this same month, Lawson reported to Craig that she had done something that she "probably should not have done in the manner [she] did." (Lawson Aff. ¶ 12; Craig Aff. ¶ 10.) Upon arriving at one of the Bethesda's homes she supervised, Lawson found the door unlocked and the home unattended, leaving medications, medical records, keys, and personal property without security. (Lawson Aff. ¶ 12; Craig Aff. ¶ 10.) Lawson told Craig that she was frustrated so she turned over a kitchen chair, hid or moved a couch cushion, and hid the key to the medicine cabinet. (Craig Aff. ¶ 10.) Lawson maintains that Craig responded by yelling very loudly at her and telling her to apologize to the staff member. (Lawson Aff. ¶ 12.)

During Faller's investigation, Bethesda received a letter, dated March 22, 2011, from Linda Bovine, who lives nears a Bethesda home, seeking to inform Bethesda of "the hostile and stressful environment caused by Cindy Lawson and the employees" at that home. (Def.'s Fact Statement Ex. AA at 1.) Bovine recounts a conversation she had with Lawson on September 28, 2010, about the poor maintenance of the house and the behavior of Bethesda employees, in

which Lawson was purportedly hostile, angry, and unprofessional. (Def.'s Fact Statement Ex. AA at 1.) Bovine details how Lawson allegedly screamed at her and used inappropriate language. (Def.'s Fact Statement Ex. AA at 3.) Specifically, Bovine relates that when she complained to Lawson about Bethesda employees putting cigarette butts in her flower bed, Lawson responded, "Boo-hoo! You've got cigarette butts in your flower-beds, well, you just pick them and bring them to me. . . . Who made you the big mouth of the neighborhood?" (Def.'s Fact Statement Ex. AA at 3.) Similarly, when discussing the landscaping and weeds on the property, Lawson purportedly told Bovine that "she wasn't going to do a damn thing about the weeds," that Bovine "could just deal with it" or maybe move, that Bovine should "just keep writing [her] letters," that she was "not afraid of anybody," and that she had "never kissed anybody's ass and [she was] not going to start now." (Def.'s Fact Statement Ex. AA at 3-4.)

According to Lawson, Bovine's letter conflates two different encounters between she and Bovine. (*See* Lawson Aff. ¶¶ 13, 15.) The first occurred in June or July of 2009 when Lawson was visiting one of her homes. (Lawson Aff. ¶ 13.) Lawson admitted that this was the incident in which she told Bovine she "would not kiss her ass to get along with her" after Bovine was rude to her about Bethesda trying to be good neighbors. (Lawson Aff. ¶ 13.) Lawson stated that she reported this situation to Craig because Bethesda had experienced previous problems with Bovine. (Lawson Aff. ¶ 13.) The second encounter was a phone conversation between Bovine and Lawson in September 2010. (Lawson Aff. ¶ 15.) Lawson contends that, in this discussion, Bovine called the individuals in the home "retarded" and accused staff of giving her "the finger" and throwing cigarette butts in her flower pots. (Lawson Aff. ¶ 15.) Lawson further denies making any of the other statements (besides the "kiss her ass" statement) that Bovine reports in

her letter.  (Lawson Aff. ¶ 15.)

On the morning of March 28, 2011, Faller interviewed Lawson as part of the ongoing investigation into her conduct.  (Faller Aff. ¶ 13; Faller Dep. 85.)  The meeting began at 9:30 a.m. and lasted until 11:00 a.m. (Faller Aff. ¶ 14; Faller Dep. 85); Craig and Shonn Foy, the Regional Director, were also present (Faller Dep. 85; Faller Aff. ¶ 11).  During the meeting, Faller discussed with Lawson her conduct towards co-workers and subordinates as well as the letter from Bovine.  (Faller Aff. ¶¶ 13-14.)  All of this was documented in a witness statement, a copy of which Faller then emailed to Lawson after the meeting to give her an opportunity to explain or otherwise rebut the performance issues outlined in the statement.  (Faller Aff. ¶¶ 15-16; *see* Def.'s Fact Statement Ex. BB (copy of the email).)  At the end of the meeting, Lawson was informed that she was being placed on administrative leave pending the completion of the investigation.  (Faller Aff. ¶ 15; Faller Dep. 83-84; Lawson Dep. 136.)

Lawson acknowledges that she was placed on administrative leave (Lawson Dep. 136, 221) and that Foy told her during the meeting that the procedure was that she had to go on administrative leave until the investigation was complete (Lawson Dep. 136).  According to Bethesda's Employee Handbook, "[e]mployees who are under investigation by Bethesda, a state agency or law enforcement department may be placed on administrative leave. . . . Upon the conclusion of the investigation, a member of Bethesda's management will meet with the employee to discuss the findings of the investigation.  If an employee is re-instated, Bethesda will make every attempt to 'make whole' the employee. . . ."  (Def.'s Fact Statement Ex. G at 6.) Lawson maintains that she was never told during the meeting that termination was a possibility. (Lawson Aff. ¶ 16.)

Later that same day, March 28, 2011, at approximately 3:15 p.m., Lawson sought treatment for anxiety from Physician Assistant ("PA") Vicki Maassel at Parkview Medical Group. (Lawson Dep. 179-80; Def.'s Fact Statement Ex. CC.) Lawson saw PA Maassel for approximately 45 minutes and did not stay overnight; she was also prescribed medication, which she subsequently filled. (Lawson Dep. 181.) Lawson further obtained a doctor's note from PA Maassel stating that she had been seen for anxiety and was unable to work from March 28, 2011, to April 5, 2011, but could return to work on April 6, 2011. (Def.'s Fact Statement Ex. CC; Lawson Dep. 186.) Around 4 o'clock that day, after her appointment ended, Lawson's husband drove her to Bethesda and then gave this note to the clerk working the front desk. (Lawson Dep. 186, 188-89; Lawson Aff. ¶ 17.)

Prior to March 28, 2011, Lawson was never diagnosed with, or missed work because of, anxiety. (Lawson Dep. 143-44, 146.) During the March 28th meeting with Faller, Craig, and Foy, Lawson did not indicate that she suffered from anxiety or any other serious health condition or that she needed time off work due to a health condition. (Faller Aff. ¶ 15.)

On March 31, 2011, three days after Faller had emailed Lawson her witness statement from the March 28th meeting, Faller received from Lawson, via email, her final response and rebuttal to the witness statement, which was the last step in the investigation process. (Faller Aff. ¶ 17; Faller Dep. 102; *see* Def.'s Fact Statement Ex. II (Lawson's final witness statement); Lawson Dep. 147-53.)

Bethesda's Employee Handbook, which Lawson twice acknowledged receiving (Def.'s Fact Statement Exs. H, I), provides that "[a]ll requests for FMLA should be made directly to the Regional Human Resources Department following the FMLA process" (Def.'s Fact Statement

Ex. G at 5). But, despite the fact that Lawson did not contact the Regional Human Resources Department, on March 31, 2011, Bethesda mailed Lawson a packet of documents that included Bethesda's Request for Leave of Absence Form, a FMLA Notice of Eligibility and Rights and Responsibilities Form, a FMLA Certification of Healthcare Provider Form, and the FMLA Employee Rights and Responsibilities Information Sheet. (Faller Aff. ¶ 18; Faller Dep. 88; *see* Def.'s Fact Statement Ex. DD (the Request for Leave of Absence Form indicating that it was mailed on March 31, 2011).) The forms instructed Lawson that she had until April 15, 2011, to return sufficient certification to support her request for FMLA leave. (Def.'s Fact Statement Ex. DD at 2.) Lawson received this package on April 2, 2011. (Lawson Dep. 194, 199-200; Def.'s Fact Statement Ex. DD (Certified Return Receipt executed by Lawson on April 2, 2011).) On April 4, 2011, Lawson completed Bethesda's Request for Leave of Absence Form. (Lawson Dep. 195; Def.'s Fact Statement Ex. FF at 2.)

The following day, April 5, 2011, Faller left Lawson a voice message and emailed her a letter notifying her that Bethesda had completed its investigation and that he had scheduled a meeting with her at 9:00 a.m. the next morning. (Faller Aff. ¶ 19; Lawson Dep. 213-17; *see* Def.'s Fact Statement Ex. JJ.) Lawson did not obtain any additional restrictions from any healthcare provider extending her time off for anxiety beyond April 5, 2011 (Lawson Dep. 199), so she returned to work and met with Faller and Craig on April 6, 2011 (*see* Faller ¶ 20). In this meeting, Faller and Craig informed Lawson that she was terminated due to her inappropriate interactions with staff, her peers, and others in the community. (Faller Aff. ¶ 20.)

Also on April 6, 2011, PA Maassel completed the Healthcare Provider portion of Lawson's FMLA Certification form. (Def.'s Fact Statement Ex. GG at 4.) In the form, PA

Maassel indicates that, during her March 28th appointment, Lawson was prescribed medication and referred for mental health counseling, but was not admitted overnight. (Def.'s Fact Statement Ex. GG at 2.) Lawson hand delivered these completed forms to Bethesda on April 8, 2011. (Lawson Dep. 196-97, 202; Lawson Aff. ¶ 19; Faller Dep. 113.)

Lawson subsequently sought review of her termination. (Lawson Dep. 258-59.) Debborah Zubke, the Division Operations Officer, sent Lawson a letter on April 21, 2011, that confirmed her termination. (Lawson Dep. 259; Def.'s Fact Statement Ex. KK.) In the letter, Zubke concluded that Lawson's termination was appropriate because her grievance did not dispute the reasons for her termination or offer many rebuttals to any accusations, her previous counseling record included "very serious" steps, the investigation listed many facts that were confirmed by people interviewed, and her employee record, including performance reviews, showed an ongoing concern of inappropriate interactions with others, similar to the concerns leading to her termination. (Def.'s Fact Statement Ex. KK.) Zubke then reiterated that Lawson was "terminated due to ongoing concerns of [her] interactions with others" and stated that the way Lawson "interacted with staff, peers and the neighbor are in conflict with [Bethesda's] mission, vision and values." (Def.'s Fact Statement Ex. KK.)

After Lawson's time off ended and she was terminated, she never followed up or obtained additional treatment for her anxiety with PA Maassel or Parkview Medical Group. (Lawson Dep. 203-04.) Once the medication PA Maassel prescribed ran out, Lawson did not refill it. (Lawson Dep. 209-10.) According to the record, Lawson next received formal medical treatment at Matthew 25 on July 19, 2011, as a new patient for "multiple issues." (Def.'s Fact Statement Ex. HH at 2; Lawson Aff. ¶ 21.) Lawson stated that she began going to Matthew 25

for her depression and anxiety, but thought that she was only actually treated there for depression and admitted that no one at Matthew 25 ever prescribed her medication for her anxiety. (Lawson Dep. 203-04.) Matthew 25's medical records from her July 19th appointment further indicate that Lawson had diabetes, high blood pressure, low potassium, depression, and right ear deafness. (Def.'s Fact Statement Ex. HH at 2; Lawson Dep. 207-09.) There is no mention of anxiety. (Lawson Dep. 209.) Furthermore, nothing in the Assessment Plan or other related medical documents indicated that Lawson suffered from anxiety. (*See* Lawson Dep. 204-11; Def.'s Fact Statement Ex. HH.) Although counseling was suggested, Lawson was not interested because she was afraid of being stigmatized as a mental patient. (Lawson Aff. ¶ 22.)

### III. STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne*, 337 F.3d at 770. When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 507 (7th Cir. 2010) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party

opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

## IV. DISCUSSION

The FMLA provides an eligible employee with a serious health condition that renders her unable to perform her position with as many as twelve workweeks of leave during any twelve-month period. *Jones v. C & D Techs., Inc.*, 684 F.3d 673, 676 (7th Cir. 2012) (citing 29 U.S.C. § 2612(a)(1)); *Goelzer v. Sheboygan Cnty.*, 604 F.3d 987, 992 (7th Cir. 2010) (citing 29 U.S.C. § 2612(a)(1)(D)). An employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" any FMLA rights. *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 825 (7th Cir. 2012) (quoting 29 U.S.C. § 2615(a)(1)). An employer is further prohibited from retaliating against employees for exercising their FMLA rights. *Id.* (citing 29 U.S.C. §§ 2615(a)(2), (b)); *Goelzer*, 604 F.3d at 992.

A FMLA interference claim is distinct from a FMLA retaliation claim; "[a]n interference claim requires proof that the employer denied the employee the FMLA rights to which she was entitled," while "a retaliation claim requires proof of discriminatory or retaliatory intent." *Nicholson*, 690 F.3d at 825 (citing *Goelzer*, 604 F.3d at 995; *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884-85 (7th Cir. 2005)). Lawson brings both a FMLA interference and a FMLA retaliation claim against Bethesda. The Court will address each claim in turn.

### A. FMLA Interference Claim

To prevail on a FMLA interference claim, an employee must show that: "(1) she was eligible for FMLA protection; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided sufficient notice of her intent to take FMLA leave;

and (5) her employer denied her the right to FMLA benefits." *Id.* (citing *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006)). The plaintiff bears the burden of proving her FMLA interference claim. *Goelzer*, 604 F.3d at 993 (citation omitted).

In the instant case, the parties dispute the last three elements—whether Lawson was entitled to take leave under the FMLA, whether she provided sufficient notice to Bethesda of her intent to take leave, and whether Bethesda denied her FMLA benefits to which she was entitled. But, because the last element is ultimately dispositive, the Court will assume for the purposes of summary judgment that Lawson suffered from a "serious health condition," which she is required to show to be entitled to FMLA leave, *see Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 669 (7th Cir. 2011), and that she provided Bethesda with sufficient notice of her intent to take FMLA leave.

To satisfy the last element of her interference claim, Lawson must show that Bethesda denied her FMLA benefits to which she was entitled. *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 825 (7th Cir. 2011). As such, Lawson must establish, by a preponderance of evidence, that she was entitled to the benefit she claims. *Pagel v. TIN Inc.*, 695 F.3d 622, 629 (7th Cir. 2012) (citing *Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799, 804 (7th Cir. 2001)). At the same time, Bethesda "may present evidence to show that [Lawson] would not have been entitled to [her] position even if [she] had not [requested] leave.'" *Id.* (quoting *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 636 (7th Cir. 2009)). Lawson must then overcome any such evidence that Bethesda offers to prevail on summary judgment. *Pagel*, 695 F.3d at 629 (citing *Cracco*, 559 F.3d at 636).

As to the last element, Bethesda first argues that Lawson was not denied FMLA leave,

but rather that she was placed on administrative leave and then terminated for her performance. (*See* Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem. in Supp.") 9-11.) Because a termination may constitute a denial of benefits, *Nicholson*, 690 F.3d at 827, the Court will focus on whether Lawson was entitled to the FMLA benefits she claims.

Bethesda maintains that it fired Lawson for poor performance and presents evidence—such as complaints about her conduct, performance evaluations, and disciplinary history—supporting that assertion. (*See* Def.'s Mem. in Supp. 9-11.) It is well-settled that "employers may fire employees for poor performance if they would have fired them for their performance regardless of their having taken leave." *Ogborn v. United Food & Commercial Works Union, Local No. 881*, 305 F.3d 763, 768 (7th Cir. 2002); *accord Simpson v. Office of Chief Judge of Circuit Court of Will Cnty.*, 559 F.3d 706, 712 (7th Cir. 2009); *see also Daugherty v. Wabash Ctr., Inc.*, 577 F.3d 747, 750 (7th Cir. 2009) ("But because the FMLA only entitles employees to the same position they would have otherwise been entitled to, 29 U.S.C. § 2614(a)(3)(B), an employer may terminate employees—even when on leave—if the employer discovers misconduct that would justify termination had leave not been taken."). To counter this evidence, Lawson states that she "believes she met or exceeded Bethesda's performance expectations," which she asserts is confirmed by Bethesda's lack of reliance on her 2009 and 2010 performance reviews. (Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Br. in Opp.") 5-6.) But such "self-interested assertions concerning one's own abilities are not themselves sufficient to raise a genuine issue of material fact as to the legitimacy of the employer's reasons for an adverse action." *Hubbard v. Blue Cross Blue Shield Ass'n*, 1 F. Supp. 2d 867, 876 (N.D. Ill. 1998); *see also Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 602 (7th

Cir. 2001) ("An *employee's* perception of his own performance, however, cannot tell a reasonable factfinder something about what the *employer* believed about the employee's abilities." (emphases in original)).

Moreover, that Bethesda did not rely on Lawson's 2009 and 2010 performance evaluations does not detract from the evidence Bethesda *did* rely on in terminating Lawson. Bethesda presents evidence of at least 13 incidents demonstrating Lawson's purportedly inappropriate conduct from 2007 to 2011.[4]  Lawson argues that her 2007 and 2008 performance evaluations, the February 2008 critical incident log, her unauthorized investigation in March 2008, the counseling record and resulting probation from April 2008, the June 2009 "proactive bullying" complaint, and the October 2010 critical incident log are "too remote in time to make a serious management decision of termination in April of 2011."  (Pl.'s Br. in Opp. 6.)  But "this court does not sit as a super-personnel department that reexamines an entity's business decisions."  *Pagel*, 695 F.3d at 630 (quoting *Balderston v. Fairbanks Morse Eng. Div. of Coltec Indus.*, 328 F.3d 309, 324 (7th Cir. 2003)).  Furthermore, nothing prevents an employer, when conducting an investigation into an employee's conduct, from delving into an employee's performance or disciplinary history to look for an actionable pattern of conduct.  *See Culver v.*

---

[4] This evidence consists of the following: (1) the September 2007 performance evaluation indicating that Lawson's ability to coach her staff needs refinement and that she must be mindful of her tone; (2) the February 2008 critical incident log reporting that Lawson was creating a negative work environment by discussing her issues concerning one manager with another manager; (3) the March 2008 incident in which Lawson, without authorization, called a BMV contact to investigate an employee; (4) Lawson's questioning of internal applicants about their interviews in April 2008, which culminated in a counseling record and Lawson being put on probation for three months; (5) the October 2008 performance evaluation indicating that Lawson still needed to refine her ability to coach her staff; (6) the June 2009 complaint accusing Lawson of "proactive bullying"; (7) the October 2010 critical incident log in which Lawson acknowledged that her tone can be intimidating, mean, and harsh; (8) Lawson making Imel drive to work despite a level one snow emergency during the February 2011 snow storm; (9) Lawson's interaction with Harvard during the February 2011 snow storm; (10) Lawson's interaction with Oakley at an unspecified time; (11) Lawson's interaction with Frazier concerning an employee's work hours in February 2011; (12) Lawson's actions when she found a Bethesda home unlocked and unattended; and (13) Lawson's purportedly unprofessional, hostile, and angry interactions with Bovine, a neighbor of a Bethesda home.

*Gorman & Co.*, 416 F.3d 540, 549 (7th Cir. 2005) ("While the relevant time for determining the effectiveness of an employee is the time of discharge, 'previous employment history may be relevant and probative in assessing performance at the time of termination.'" (quoting *Fortier v. Ameritech Mobile Commc'ns*, 161 F.3d 1106, 1113 (7th Cir. 1998))).

And, regardless, Lawson does not dispute that Bethesda initiated an investigation into her conduct in February 2011, over a month before she even requested FMLA leave. *See Simpson*, 559 F.3d at 713 (noting that the investigation that revealed the employee's misconduct began months before the employee ever mentioned taking medical leave). This investigation resulted in several witness statements by Bethesda employees, given in early March 2011, detailing Lawson's inappropriate interactions with staff and peers that primarily occurred the month before and a letter from a member of the community describing Lawson's purportedly unprofessional and hostile behavior that was received on March 22, 2011. Lawson argues that Bethesda's reliance on these incidents to justify her termination is merely pretext. (*See* Pl.'s Br. in Opp. 6-8.) But while the Court reviews whether the employer's reasons for its action are honestly held beliefs, the employee bears the burden of proving a FMLA violation; as such, under that statutory regime, "pretext may have evidentiary value, but showing pretext does not necessarily satisfy the employee's burden." *Kohls*, 259 F.3d at 806. Lawson, however, not only fails to satisfy her initial burden of showing she was entitled to the benefits she claims, but also fails to present any evidence of pretext.

Although Lawson disputes much of the factual content of the witness statements gathered in the February 2011 investigation, she admitted that her harsh tone with employees and possibly other managers had been an issue since 2003 (Lawson Dep. 98-99) and that she told Bovine that

she "would not kiss her ass to get along with her," though she disputes when this occurred (Lawson Aff. ¶ 13). Furthermore, Lawson does not deny that when she was talking to her employees over the phone during the February 2011 snow storm, even her husband told her she "needed to stop" (Craig Aff. ¶ 8; *see* Lawson Aff. ¶ 7 (where Lawson does not dispute this part of Craig's affidavit)), that she had entered an unlocked Bethesda home and purposely moved or hid objects (Craig Aff. ¶ 10; *see* Lawson Aff. ¶ 12 (where Lawson does not deny this part of Lawson's affidavit)), or that she received performance evaluations noting her difficulties interacting with her staff (*see* Def.'s Fact Statement Exs. P, Q) and discipline for her behavior towards other employees (*see* Def.'s Fact Statement Exs. R, S, V).

All of these undisputed incidents support Bethesda's stated reason for terminating Lawson—her inappropriate interactions with staff, peers, and others in the community (Faller Aff. ¶ 20)—rather than Lawson's claim that Bethesda fired her for requesting FMLA leave. *See Daugherty*, 577 F.3d at 750-51 (holding that there was no genuine dispute that the employee was not entitled to reinstatement when there was undisputed evidence that, among other things, he engaged in unprofessional email exchanges with other employees and was abusive to his staff, and the employer admitted his professional shortcomings). Moreover, Lawson fails to offer any evidence that she was performing well in these specific areas that prompted her termination. *Hubbard*, 1 F. Supp. 2d at 876 (citing *Anderson v. Stauffer Chem. Co.*, 965 F.2d 397, 403 n.2 (7th Cir. 1992) (noting that a plaintiff must show adequate performance in the specific area in which the employer claims is deficient)).

Lawson further questions the credibility of at least one of the witnesses who gave a witness statement during Bethesda's investigation. (*See* Lawson Aff. ¶ 10; Pl.'s Br. in Opp. 7

(questioning Frazier's credibility).)  But it is not this Court's place to make such credibility

determinations, *Payne*, 337 F.3d at 770, and "neither a desire to cross-examine an affiant nor an

unspecified hope of undermining his or her credibility suffices to avert summary judgment,"

*Carroll v. Lynch*, 698 F.3d 561, 566 (7th Cir. 2012) (quoting *Nat'l Union Fire Ins. Co. v.

Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983)).

 Not to be deterred, Lawson argues that her case is analogous to that of the plaintiff in

*Goelzer*, 604 F.3d at 993-95, where the Seventh Circuit found that a genuine issue of material

fact existed about whether the plaintiff was not reinstated because she exercised her right to take

FMLA leave.  In *Goelzer*, however, there was significant evidence that the decisionmaker was

focused on Goelzer's attendance and arguably frustrated with her use of FMLA leave,

commenting somewhat negatively on her FMLA-covered absences in several performance

evaluations and finally terminating her as she was beginning a two month FMLA leave.  *Id.* at

995.  Other courts have also found that such indications of employer displeasure give rise to

factual issues that defeat summary judgment.  *See Rodriguez ex rel. Fogel v. City of Chicago*,

No. 08 CV 4710, 2011 WL 1103864, at *11 (N.D. Ill. Mar. 25, 2011); *Peters v. Gilead Sciences,

Inc.*, No. 1:04-cv-1338-JDT-TAB, 2006 WL 2054373, at *13 (S.D. Ind. July 21, 2006).  No such

evidence is present in this case.

 Ultimately, Bethesda has set forth substantial evidence that Lawson would have been

fired for her poor performance even if she had not requested a brief FMLA leave.  Bethesda

undisputedly started the investigation into Lawson's conduct over a month before she even

requested FMLA leave and interviewed several witnesses, including Lawson herself, uncovering

multiple incidents of Lawson's inappropriate interactions with staff, peers, and a member of the

community.  Lawson has simply not come forward with sufficient evidence that would lead a

reasonable trier of fact to conclude that these purportedly inappropriate interactions did not

occur—indeed, Lawson admits many of them, although not quite as Bethesda describes

them—or that Bethesda's investigation of those allegations was a sham.  *See Cracco*, 559 F.3d at

636.  As such, because Lawson has presented no evidence supporting her assertion that she

would have been retained had she not requested FMLA leave, her interference claim fails.  *Id.*

### B.  FMLA Retaliation Claim

Along with her interference claim, Lawson also argues that Bethesda fired her in

retaliation for requesting FMLA leave.  An employer cannot consider an employee's use, or

attempted use, of FMLA leave as a negative factor in promotion, termination, and other

employment decisions.  *Pagel*, 695 F.3d at 631.  Unlike an interference claim, a retaliation claim

requires proof of the employer's discriminatory or retaliatory intent.  *Nicholson*, 690 F.3d at 825.

But "the plaintiff does not need to prove that retaliation was the *only* reason for her termination;

she may establish an FMLA retaliation claim by showing that the protected conduct was a

substantial or motivating factor in the employer's decision."  *Goelzer*, 604 F.3d at 995 (quoting

*Lewis v. Sch. Dist. # 70*, 523 F.3d 730, 741-42 (7th Cir. 2008)) (internal quotation marks

omitted).  In making out a retaliation claim, a plaintiff may proceed under the direct or indirect

method of proof.  *Burnett*, 472 F.3d at 481 (citing *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496,

503 (7th Cir. 2004)).  Lawson proceeds under only the direct method.  (Pl.'s Br. in Opp. 13.)

Under the direct method, Lawson must present evidence of the following: (1) a statutorily

protected activity; (2) a materially adverse action taken by the employer; and (3) a casual

connection between the two.  *Daugherty*, 577 F.3d at 751 (citation omitted).  Bethesda contests

both the first and third elements. As to the first element, Bethesda argues that Lawson did not engage in protected activity because she did not suffer from a serious health condition, and therefore did not qualify for FMLA, and that she also failed to provide sufficient notice of any intent to take FMLA leave. (Def.'s Mem. in Supp. 12.) Because the causation element is ultimately dispositive, however, the Court will assume that Lawson engaged in FMLA-protected activity.

To prove the causal-nexus element under the direct method of proof, "the plaintiff must have sufficient evidence, direct or circumstantial, that her employer intended to punish her for requesting or taking FMLA leave." *Nicholson*, 690 F.3d at 828 (citing *Smith v. Hope Sch.*, 560 F.3d 694, 702 (7th Cir. 2009)). If the plaintiff's evidence is then contradicted, "the case must proceed to trial unless the employer presents unrebutted evidence that it would have taken the adverse action against the plaintiff even if it did not have a retaliatory motive." *Goelzer*, 604 F.3d at 995 (citation omitted). As such, Lawson can survive summary judgment by creating a triable issue of whether her termination had a retaliatory motive. *Id.* at 995-96.

Lawson can prevail under the direct method by showing an admission by Bethesda or by "constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 771 (7th Cir. 2008) (quoting *Phelan v. Cook Cnty.*, 463 F.3d 773, 779 (7th Cir. 2006)) (internal quotation marks omitted). This "convincing mosaic of circumstantial evidence may include suspicious timing, ambiguous statements from which a retaliatory intent can be drawn, evidence of similar employees being treated differently, or evidence that the employer offered a pretextual reason for the termination." *Pagel*, 695 F.3d at 631 (citing *Jajeh v. Cnty. of Cook*, 678 F.3d 560,

570 (7th Cir. 2012)). Lawson concedes that there is no admission of retaliation by the decisionmaker in this case and, as such, relies exclusively on circumstantial evidence. (Pl.'s Br. in Opp. 13-14.)

Lawson primarily sets forth three pieces of circumstantial evidence: (1) the timing of Bethesda's decision to fire her; (2) that she was not told she was subject to termination consistent with Bethesda's progressive discipline policy; and (3) that she was "blind-sided" by Bethesda's allegations of her purported performance deficiencies. (*See* Pl.'s Br. in Opp. 9-10, 14.)

First, Lawson argues that the timing of her termination constitutes circumstantial evidence of Bethesda's retaliatory intent. Bethesda, through Faller, began an investigation into Lawson's conduct in February 2011. On March 28, 2011, Faller interviewed Lawson as part of this investigation and then put her on administrative leave pending completion of the investigation. On the same day, Faller emailed Lawson a copy of her witness statement so that she could make corrections or rebut the contents. Three days later, on March 31st, Faller received Lawson's rebuttal statement, which was the last step in the investigation process. Faller contacted Lawson on April 5, 2011, asking to meet with her the next day to go over the findings of the investigation. During this April 6, 2011, meeting, Lawson was terminated.

Lawson finds it suspicious that Bethesda terminated her on April 6th, given that the investigation was essentially complete by March 31st. (*See* Pl.'s Br. in Opp. 9-10.) Lawson appears to argue that "[t]he only reasonable answer" for this six-day delay (covering only three business days) is that her request for FMLA leave on March 28th tipped the scale in favor of termination. (Pl.'s Br. in Opp. 9-10.) She further attempts to place significance on the fact that

the decision to terminate her was apparently made before April 5, 2011, when she was still on leave, and that Bethesda waited to the end of her "medical leave"—April 6, 2011—to terminate her.[5]  (Pl.'s Br. in Opp. 3, 9.)

 An employee's termination while on leave could, under some circumstances, create an inference of discriminatory motive if, for example, "a supervisor who had been aware of problems with an employee did not decide to fire the employee until she took leave, and the supervisor based the firing on the incidents of which the employer had already been aware." *Simpson*, 559 F.3d at 713 (quoting *Kohls*, 259 F.3d at 805-06); *accord Daugherty*, 577 F.3d at 751.  But the Seventh Circuit "has held repeatedly that temporal proximity alone is not sufficient to withstand summary judgment."  *Daugherty*, 577 F.3d at 751 (citing *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006); *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004)).

Beyond this temporal proximity, however, Lawson presents no evidence that actually ties her termination to her FMLA request.  By the time Lawson submitted the request she had already been placed on *administrative* leave, subject perhaps to possible reinstatement, pending completion of Faller's ongoing investigation into her conduct.   The investigation concluded on March 31st when Lawson returned her rebuttal statement.  Bethesda then waited three business days to terminate Lawson, doing so on the day she returned from leave.  Nothing in this timeline suggests that her FMLA request, submitted after she was placed on administrative leave (and

---

[5] Although Lawson refers to this as medical leave, it is not FMLA leave as Lawson had not turned in her FMLA paperwork at this point.  Bethesda apparently never determined whether this leave qualified as FMLA leave since it terminated Lawson before she turned in her paperwork.

with the wheels of termination thus already in motion), was a substantial or motivating factor in her termination.

After all, Bethesda had no indication that Lawson would later request FMLA leave when it put her on administrative leave, pending the completion of its investigation.  And there is nothing sinister in Bethesda taking three business days, at the most, and after receiving Lawson's rebuttal, to decide to fire her or that it made this decision while she was still on leave.  Arguably, it could be said, Bethesda was respecting Lawson's leave by waiting until she was medically released to return to work before meeting with her.

As to Lawson's claim that she was not told she was subject to termination pursuant to Bethesda's progressive discipline policy, Bethesda states that it does not subscribe to a progressive disciplinary policy and cites a page in its handbook in support.  (Reply Br. in Supp. of Def.'s Mot. for Summ. J. 7 (citing "Handbook, Ex. G, p. 25").)  This page of Bethesda's handbook, however, is not in the record so the Court cannot verify the contents of its disciplinary policy.  But, even if Bethesda did have a progressive disciplinary policy, Bethesda was not required to follow it.  *Parnell v. Hometown Distrib. Co.*, No. 04 C 3739, 2006 WL 314518, at *15 (N.D. Ill. Feb. 7, 2006); *see Anderson*, 965 F.2d at 402 (holding that employer with progressive discipline policy was not required to use it); *Randall v. Unitech Sys., Inc.*, 243 F. Supp. 2d 822, 832 (N.D. Ill. 2003) (holding that employer's failure to follow progressive discipline program, without some doubt raised as to its genuineness for not doing so, does not imply discrimination); *Barakat v. Taco Bell, Inc.*, 970 F. Supp. 634, 640 (N.D. Ill. 1997) (same).  And although "an employer's departure from its own employment policies can constitute circumstantial evidence of discrimination," *Long v. Teacher's Ret. Sys.*, 585 F.3d 344, 352-53

(7th Cir. 2009) (citations omitted), Lawson offers no evidence—except perhaps her own unsupported assertion—that Bethesda even had a progressive disciplinary policy that required prior notice before possible termination (*see* Pl.'s Br. in Opp. 9 (where Lawson cites no evidence to support this assertion)).  Perhaps even more importantly, Lawson offers no evidence that such a policy, if it existed, was rigorously enforced.  *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 541 (7th Cir. 2007) (holding that no reasonable jury could conclude that the employer's failure to follow progressive discipline procedures suggested discrimination when the employee offered no evidence that this policy was rigorously enforced).

Furthermore, Bethesda did not summarily terminate Lawson after merely one misstep; rather, the record contains several reports of inappropriate conduct, a counseling record implementing three months of probation, and a thorough investigation into Lawson's behavior before her firing, indicating at least some incremental discipline.  Moreover, Bethesda *did* follow its stated policies in putting Lawson on administrative leave during the pendency of the investigation and in meeting with her on April 6, 2011, to discuss the findings of the completed investigation.  (*See* Def.'s Fact Statement Ex. G at 6 ("Employees who are under investigation by Bethesda . . . may be placed on administrative leave. . . . Upon the conclusion of the investigation, a member of Bethesda's management will meet with the employee to discuss the findings of the investigation.").)  And, even if Lawson was not explicitly informed during the March 28, 2011, meeting that termination was a possibility (Lawson Aff. ¶ 6), Bethesda's administrative leave policy, described in the handbook that Lawson twice acknowledged receiving, implies that termination after the completion of the investigation is certainly a possibility (*see* Def.'s Fact Statement Ex. G at 6 ("*If an employee is re-instated*, Bethesda will

make every attempt to 'make whole' the employee." (emphasis added)). As such, Bethesda's failure to explicitly inform Lawson that termination was a possibility when she was put on administrative leave does not suggest that retaliation was at work.

And finally, despite Lawson's claim that she was "blind-sided" by her performance deficiencies, Bethesda's actions can hardly be described as a "bolt out of the blue." Indeed, the record contains substantial evidence documenting Lawson's pattern of inappropriate interactions with staff, peers, and others—as well as her knowledge and admission of several of these incidents. (*See* Lawson Dep. 98-99 (where Lawson admitted her harsh tone had been an issue for years); Lawson Aff. ¶ 7 (where Lawson does not dispute the part of Craig's affidavit indicating that Lawson's husband told her she "needed to stop" when she was speaking to her employees during the February 2011 snow storm), ¶ 12 (where Lawson does not deny that she entered an unlocked Bethesda home and purposely moved or hid objects), ¶ 13 (where Lawson admitted to telling a Bethesda neighbor that she "would not kiss her ass to get along with her"); Def.'s Fact Statement Ex. P (Lawson's 2007 performance evaluation indicating that she needed to be mindful of her tone and refine her ability to coach her staff); Def.'s Fact Statement Ex. Q (Lawson's 2008 performance evaluation reiterating that she needed to refine her ability to coach her staff).)

Furthermore, it is not the court's role "to tell employers how to discipline employees; rather, it is to ensure that the process is not discriminatory." *Kohls*, 259 F.3d at 805. As such, Bethesda has presented unrebutted evidence that it would have terminated Lawson even if she had never requested FMLA leave, and Lawson has not shown that her FMLA request was a substantial or motivating factor in Bethesda's decision, an indispensable element for a retaliation

claim to survive summary judgment. *Goelzer*, 604 F.3d at 995.

And, as to pretext, which Lawson does not explicitly argue exists here, Bethesda's explanation for firing Lawson can be "foolish or trivial or even baseless" so long as it "honestly believed" those proffered reasons. *Culver*, 416 F.3d at 547. "Summary judgment is appropriate only if a reasonable fact finder would be compelled to believe [Bethesda's] explanation, . . . and [Lawson] can avoid summary judgment by pointing to specific facts that place the employer's explanation in doubt." *Id.* (citations omitted). Lawson, however, has failed to point to any specific facts that would create a triable issue concerning pretext. Accordingly, as with Lawson's FMLA interference claim, Bethesda is entitled to summary judgment on her FMLA retaliation claim.

## V.  CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's Motion for Summary Judgment (Docket # 33) and DIRECTS the Clerk to enter judgment in favor of Defendant Bethesda Lutheran Communities, Inc., and against Plaintiff Cindy Lawson. The Motion to Strike (Docket # 42) is deemed MOOT.

SO ORDERED.

Entered this 27th day of November, 2012.

/s/ Roger B. Cosbey
Roger B. Cosbey
United States Magistrate Judge